# Illinois Official Reports

## Appellate Court

---

### *Cohen v. Chicago Park District*, 2016 IL App (1st) 152889

---

| | |
|---|---|
| Appellate Court Caption | ISAAC COHEN, Plaintiff-Appellant, v. CHICAGO PARK DISTRICT, Defendant-Appellee. |
| District & No. | First District, Fourth Division<br>Docket No. 1-15-2889 |
| Filed<br>Rehearing denied | October 27, 2016<br>December 7, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-5476; the Hon. William E. Gomolinski, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Schiff Gorman, LLC (Elliot R. Schiff, of counsel), and Marasa Lewis, Ltd. (Jill B. Lewis, of counsel), both of Chicago, for appellant.<br><br>George P. Smyrniotis and Fabian Guana, of Chicago, for appellee. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices McBride and Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiff, Isaac Cohen, injured his shoulder after riding over a defect in the Lakefront Trail and falling off of his bike. He filed suit against defendant, the Chicago Park District (Park District), claiming it engaged in willful and wanton conduct by failing to repair the defect. The trial court granted summary judgment in favor of the Park District, finding it was immune from liability under section 3-107(a) of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/3-107(a) (West 2012)), which grants absolute immunity to local entities for injuries caused by a condition of a "road which provides access to fishing, hunting, or primitive camping, recreational, or scenic areas." The court also found the Park District's conduct was not willful and wanton and thus, even if section 3-107(a) of the Act did not apply, the Park District was immune from liability under section 3-106 of the Act (745 ILCS 10/3-106 (West 2012)), which provides immunity for injuries occurring on recreational areas, except where a local public entity engages in willful and wanton conduct proximately causing the injuries. *Id.*

¶ 2    On appeal, plaintiff argues the trial court erred by (1) finding the Lakefront Trail fell within the scope of section 3-107(a) of the Act, (2) finding section 3-107(a) of the Act governed instead of section 3-106, and (3) finding as a matter of law that the jury could never find the Park District's conduct to be willful and wanton.

¶ 3    We conclude the trial court erred by finding section 3-107(a) of the Act applied and by finding no genuine issue of fact existed as to whether the Park District's conduct was not willful and wanton. Accordingly, we reverse the court's grant of summary judgment and remand for further proceedings.

¶ 4                                    I. BACKGROUND

¶ 5    Plaintiff testified in a deposition that on a Sunday morning in July 2013 he was riding his bike southbound on the Lakefront Trail near the Shedd Aquarium when he veered toward the middle of the trail to pass a pedestrian.[1] His wheel became caught in a crack in the concrete. The crack was about three or four feet long, two to three inches deep, and three to four inches wide at its widest part. Plaintiff fell, injuring his shoulder. The next week, he went for another bike ride and noticed the defect had been repaired.

¶ 6    In 2011, the Park District partnered with the Active Transportation Alliance to study Lakefront Trail usage. Plaintiff attached the Active Transportation Alliance's report to its response to the Park District's motion for summary judgment. The Alliance's report, and the deposition testimony of various Park District employees, established that the Lakefront Trail is an approximately 18-mile, multi-use trail that runs along the lakefront from Ardmore Street on the north to 71st Street on the south. It is made of concrete and asphalt and contains over 50 access points. The purpose of the Lakefront Trail is to provide recreation. It is designed for use by bicyclists, and the Park District's mission is to keep the Lakefront Trail safe for bicyclists.

_____

[1]Plaintiff testified in his deposition that the accident may have occurred on July 7, 2013, but he could "not say for sure." He also testified the incident could have occurred "maybe" in the beginning of August; however, he thought it occurred in July. Plaintiff knew the accident happened on a Sunday and that by the following Sunday, the defect had been repaired. It is undisputed that the defect was repaired on July 10, 2013. Accordingly, the evidence suggests plaintiff's accident occurred on July 7, 2013.

The Lakefront Trail is not open to the public for vehicular travel; however, Park District maintenance vehicles utilize the trail. According to the deposition testimony of Park District employee Robert Thompson, the Lakefront Trail provides access to scenic views and various recreational areas such as a golf course, beaches, softball fields, tennis courts, and harbors.[2] The Park District's overall mission is to (1) enhance the quality of life in Chicago by becoming the leading provider of recreation and leisure opportunities; (2) provide safe, inviting, and beautifully maintained parks and facilities; and (3) create a customer-focused and responsive park system that prioritizes the needs of children and families.

¶ 7    The Active Transportation Alliance's report showed more than 70,000 people access the trail on a typical summer weekend day and more than 60,000 people access it on a typical summer weekday. The study indicated the trail is a primary transportation corridor for bicycle commuters and is an integral part of Chicago's bicycle transportation network. During the study, 70% of people who accessed the trail were pedestrians, 29% were bicyclists, and 1% were other users. The report stated the Lakefront Trail is also used by "people training for marathons, parents with children in strollers, tourists on rental bikes, couples on in-line skates, teens on skateboards, and thousands of other people using the trail for commuting, training or just taking a leisurely stroll." At the time of the Alliance's report, the trail was "officially" closed between 11 p.m. and 6 a.m.

¶ 8    Linda Daly, Park District deputy director of capital construction, and Robert Rejman, Park District director of planning and construction, testified in depositions that man-made structures such as paved basketball courts, showers and restrooms, bike rental facilities, golf courses, parking lots, baseball fields, vendors, skate parks, and at least three bars and restaurants surround the Lakefront Trail. The grass around the Lakefront Trail is mowed, trees are trimmed, and gardens are maintained. Hunting around the trail is prohibited.

¶ 9    Park District employee William Gernady testified in a deposition that he inspects the Lakefront Trail annually for defects, including cracks in the pavement. Gernady has inspected the trail for 14 years. Every spring, Gernady drives along the Lakefront Trail twice and measures and marks with paint the areas that need to be repaired. Per his own policy, Gernady has any defect deeper than one and a half inches repaired.

¶ 10    After conducting his inspection, Gernady compiles a scope of repairs to be performed and creates a request for proposal to collect bids from a pool of pre-qualified "rapid response" contractors. The "rapid response" program is an expedited procurement process for the Park District through which most Lakefront Trail repairs are conducted. According to Rejman's deposition testimony, rapid response requests are used for "jobs that aren't absolutely necessary" and do not present safety concerns. Gernady testified the Park District notifies a contractor that it has accepted the contractor's bid by providing the contractor with a "notice to proceed." According to Rejman, the Park District also typically provides the contractor with an anticipated schedule indicating the date upon which the Park District would like the repair to be completed. At times, Gernady supervises the contractors' repairs.

¶ 11    Daly testified that if Gernady discovered a defect during his inspection that he believed to be an emergency, that defect could "potentially" be priced out immediately, on its own, instead

_____

[2]Thompson testified in an unrelated case, and the Park District attached Thompson's testimony to its motion for summary judgment. On appeal, plaintiff challenges the Park District's reliance on Thompson's testimony. We address plaintiff's argument in this regard later in this opinion.

of being included in the "scope of work" with the other repairs. Rejman testified that to expedite the repair process, the Park District can alert contractors that a repair is urgent. Gernady testified the Park District can also immediately contact a contractor, instead of submitting a notice to proceed, and instruct the contractor that he is allowed to proceed with the work. Rejman testified that at times, a contractor will make a repair within a few days; however, this depends on the availability of contractors, and repairs can "take a little bit longer" during a busy time of year. Gernady testified repairs can be completed "[w]ithin one day sometimes."

¶ 12    Rejman testified that the Park District has blocked off areas of the Lakefront Trail with barricades and signs when those areas have been impassable due to difficult conditions. Rejman explained these larger barriers have been erected "in areas where a lot of damage has been done." Rejman was not "aware" of the Park District ever marking potholes or cracks with bright-colored paint; however, he "would think" this was something the Park District was capable of doing. He did not think the Park District would place cones near cracks or holes because "the cones wouldn't stay there for very long."

¶ 13    Robert Arlow, the Park District's director of facility management, testified in a deposition that he manages tradesmen who maintain and repair Park District buildings. Generally, Arlow's department does not perform maintenance and repair work to the Lakefront Trail because it does not have an asphalt crew. However, if an absolute need arose to repair "a small thing," Arlow "could probably send a carpenter out with a bag of asphalt." Arlow only knew of this happening on one occasion, in June 2014. According to Arlow, the Lakefront Trail is repaired almost exclusively by outside contractors.[3]

¶ 14    Arlow receives complaints from Park District patrons about park conditions in need of repair. When he receives a call, Arlow inspects the defect himself or asks somebody else to check the defect and determine its severity. If Arlow determines the condition needs to be fixed, he calls a general foreman and tells him to send somebody to look at the condition and determine the type of repair that can be performed.

¶ 15    In the spring of 2013, Arlow received a call from a patron informing him of a defect on the Lakefront Trail between the Shedd Aquarium and South Lake Shore Drive. Arlow did not know the exact date he received the call, but because snow was not on the ground, he assumed it "had to be later than April." Arlow inspected the defect within a few days of receiving the call and determined it was in need of repair. He contacted Gernady. Arlow did not know why he did not have a Park District laborer immediately fill the defect with asphalt.

¶ 16    Gernady testified he recalled receiving Arlow's call regarding a dangerous crack in the "time zone of June" 2013. According to Gernady, this was the only 2013 Lakefront Trail repair that was classified as an emergency. Gernady included the crack in the scope of work that he prepared to solicit bids from the rapid response contractors. On June 10, 2013, the Park District sent a request for proposal to the rapid response contractors.

_____

[3]During her deposition, Linda Daly was asked whether Park District employees ever conduct repairs in-house. She responded that "[i]t would come through Bob Arlow's department. I don't know if they've done Lakefront Trail repairs." Later, Daly testified if Arlow could not repair something in-house, he would ask Daly's department to solicit an outside contractor. Daly confirmed that Arlow or his staff would first see whether they could address the issue themselves.

¶ 17    On June 12, 2013, Meccor Industries submitted a proposal. On June 19, the Park District sent a notice to proceed to Meccor Industries. It did not include a completion deadline. Subcontractor Beverly Asphalt Paving Company (Beverly) repaired the defect on July 10, 2013. Gernady testified that before doing so, Beverly completed a repair on another part of the Lakefront Trail on June 19, 2013. Gernady could not explain the reason for the gap in Beverly's work between June 19 and July 10.

¶ 18    About a year later, in approximately June 2014, Arlow received another complaint from a patron about the trail's condition near the Shedd Aquarium. After viewing the condition, Arlow determined it was "[s]imilar but not as severe as where the accident occurred." Arlow had the crack filled by in-house laborers.

¶ 19    In May 2014, plaintiff filed a complaint against the Park District, alleging it engaged in willful and wanton conduct by failing to repair the defect.[4] The Park District filed an answer, claiming its conduct was not willful or wanton. The Park District also filed an affirmative defense, asserting it was entitled to absolute immunity under section 3-107(a) of the Act.

¶ 20    In May 2015, the Park District filed a motion for summary judgment arguing, *inter alia*, that it was entitled to absolute immunity under section 3-107(a) of the Act because the Lakefront Trail was an "access road" to fishing, hunting, recreational, and scenic areas. The Park District further argued that even if it was not entitled to immunity under section 3-107(a) of the Act, it was entitled to immunity under section 3-106 of the Act because its conduct was not willful and wanton.

¶ 21    In July 2015, the trial court granted the Park District's motion for summary judgment, finding the Park District was immune under section 3-107(a) of the Act because the Lakefront Trail was the type of road envisioned by that portion of the statute. The court also found that, even if section 3-107(a) of the Act did not apply, plaintiff failed to raise any material fact that the Park District engaged in willful and wanton conduct. The court found plaintiff's allegations of utter indifference to or conscious disregard for the safety of others were meritless, as the Park District took affirmative steps to correct the defect after learning of it.

¶ 22    In August 2015, plaintiff filed a motion to reconsider, which the trial court denied. This appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, plaintiff argues the trial court erred by (1) finding the Lakefront Trail fell within section 3-107(a) of the Act, (2) finding section 3-107(a) of the Act governed instead of section 3-106, and (3) finding as a matter of law that the jury could never find the Park District's conduct to be willful and wanton. We address plaintiff's arguments in turn.

¶ 25                    A. Absolute Immunity Under Section 3-107(a) of the Act

¶ 26    Plaintiff first alleges the trial court erred by finding the Park District was immune from liability under section 3-107(a) of the Act. Specifically, plaintiff contends section 3-107(a) applies only to roads providing access to primitive recreational and scenic areas. Plaintiff

---

[4]Plaintiff also named the City of Chicago as a defendant. However, after the Chicago Park District admitted ownership and maintenance responsibilities for the Lakefront Trail, the City filed a motion to dismiss, which the trial court granted.

observes the Lakefront Trail is a paved, non-primitive, linear park surrounded by developed, commercial areas. Plaintiff maintains that in finding the Lakefront Trail fell within section 3-107(a), the court ignored Illinois rules of statutory construction, case law, and public policy concerns associated with granting the Park District absolute immunity.

¶ 27    In interpreting section 3-107(a) of the Act, our primary objective is "to ascertain and give effect to the intent of the legislature." (Internal quotation marks omitted.) *Brunton v. Kruger*, 2015 IL 117663, ¶ 24. The best reflection of the legislature's intent is the statute's language, which we give its plain and ordinary meaning. *Id.* Words and phrases in a statute must be interpreted in light of other relevant statutory provisions and the statute as a whole, rather than in isolation. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604 (2008). We may also consider the purpose of the law and the consequences that would result in interpreting the statute one way or the other. *Id.* We presume the legislature did not intend absurdity, inconvenience, or injustice. *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007).

¶ 28    "A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways." (Internal quotation marks omitted.) *Brunton*, 2015 IL 117663, ¶ 24. Where statutory language is unclear or ambiguous, we may employ extrinsic aids of interpretation. *Id.* One such aid is the doctrine of *in pari materia*, pursuant to which we construe two statutes dealing with the same subject "so that they may be given harmonious effect." (Internal quotation marks omitted.) *Collinsville Community Unit School District No. 10 v. Regional Board of School Trustees*, 218 Ill. 2d 175, 185 (2006). However, this rule is subordinate to the "cardinal rule" of statutory construction that we must ascertain and give effect to the legislature's intent. *Id.* at 186. Where a statute within the Act contains an ambiguity, the statute will be strictly construed against the public entity because the Act's immunities "are in derogation of the common law." *McElroy v. Forest Preserve District*, 384 Ill. App. 3d 662, 666 (2008). Statutory interpretation involves a question of law, and accordingly, our standard of review is *de novo*. *Brunton*, 2015 IL 117663, ¶ 24.

¶ 29    Section 3-107(a) of the Act provides that a local public entity is not liable for an injury caused by a condition of "[a]ny road which provides access to fishing, hunting, or primitive camping, recreational, or scenic areas and which is not a (1) city, town or village street, (2) county, state or federal highway or (3) a township or other road district highway." 745 ILCS 10/3-107(a) (West 2012).

¶ 30    The dispute in this case centers in part on the legislature's use of the word "primitive." Plaintiff argues that "primitive" modifies "camping," "recreational," and "scenic" and thus, section 3-107(a) grants absolute immunity only for injuries occurring on roads that provide access to "primitive" camping areas, "primitive" recreational areas, and "primitive" scenic areas. The Park District, by contrast, maintains that the word "primitive" applies solely to "camping" and not to "recreational" or "scenic" areas. The parties also dispute whether the Lakefront Trail is an "access road" within the meaning of the statute. Plaintiff contends the trail itself is recreational property that falls within section 3-106 of the Act and, thus, it is not an "access road" to recreational or scenic areas.[5] In addition, plaintiff posits, the Lakefront Trail is not a "road."

_____

[5]As evidence of the various recreational areas to which the Lakefront Trail provided access, the Park District attached to its summary judgment motion the deposition testimony of a former Park District employee in an unrelated case. On appeal, plaintiff challenges the inclusion of such testimony.

- 6 -

¶ 31    In finding section 3-107(a) applied to the Lakefront Trail, the trial court relied on the decision in *Scott v. Rockford Park District*, 263 Ill. App. 3d 853 (1994). There, a child was injured while riding his bike over a bridge that provided access to a public park. *Id.* at 854. The appellate court concluded the bridge fell within section 3-107(a) of the Act, despite the plaintiffs' arguments that section 3-107 applied only to wilderness areas and that the bridge was not a road providing access to fishing, hunting, or primitive camping areas, recreational, or scenic areas. *Id.* at 855, 858. The *Scott* court reasoned that the plain language of the statute unambiguously granted "full immunity for access roads to fishing, hunting, primitive camping areas, recreational areas, and scenic areas." *Id.* at 857. The court also stated the statute's "requirement of 'primitiveness' clearly [did] not apply to the nature of access roads but, rather, to any camping areas thereby provided access." *Id.* In reaching its decision, the court rejected the plaintiffs' assertion that because the park and bridge were covered by section 3-106 of the Act, they were not encompassed by section 3-107. *Id.* at 856. The court found the "primary distinction" the legislature intended to draw in enacting sections 3-106 and 3-107 was between, on the one hand, recreation areas (section 3-106) and, on the other hand, roads other than streets or highways used to access recreational areas and trails (section 3-107). *Id.* The court found "no conflict in the legislature's determination that local entities should be immune from liability only for negligent actions connected with the broader category of properties covered in section 3-106 while they would receive full immunity covering the trail and access-road properties covered in section 3-107." *Id.* at 856-57. Further, the court stated, it was unaware of any clear indication that "access roads" under section 3-107(a) were only those roads "providing access to wilderness areas." *Id.* at 857.

¶ 32    The Park District argues that *Scott* should control. Plaintiff, on the other hand, recognizes the *Scott* decision but argues that in more recent cases such as *Goodwin v. Carbondale Park District*, 268 Ill. App. 3d 489 (1994), and *Brown v. Cook County Forest Preserve*, 284 Ill. App. 3d 1098 (1996), Illinois courts have found section 3-107 applies only to roads or trails in undeveloped areas. Plaintiff notes that in *Scott*, the court stated it was unaware of any indication that "access" roads were limited to roads providing access to wilderness areas. See *Scott*, 263 Ill. App. 3d at 857. Plaintiff posits that because *Scott* predated *Goodwin* and *Brown*, the *Scott* court did not have the benefit of those decisions when determining that access roads were not limited to roads providing access to "wilderness" areas. According to plaintiff, *Scott* is the sole Illinois decision to apply section 3-107 outside of the confines of a forest preserve.

¶ 33    In *Goodwin*, the plaintiff was injured when his bicycle collided with a tree that had fallen across a paved bike path in a city park controlled by the defendant, a park district. *Goodwin*, 268 Ill. App. 3d at 490. The appellate court found the defendant was not entitled to immunity under section 3-107(b) of the Act, which immunizes a public entity from liability for injuries caused by a condition of a " 'hiking, riding, fishing or hunting trail.' " *Id.* at 491, 494 (quoting 745 ILCS 10/3-107(b) (West 1992)). Specifically, the court found the path was not a "riding trail" within the meaning of section 3-107(b) of the Act. *Id.* at 492. The court noted that although sections 3-106 and 3-107 of the Act both applied to recreational property, section

The Park District responds that plaintiff failed to challenge the testimony in the trial court and, in any event, the depositions could be used pursuant to Illinois Supreme Court Rule 212(a)(4) (eff. Jan. 1, 2011). We need not resolve this dispute because we find section 3-107(a) of the Act relates only to primitive recreational and scenic areas; accordingly, the deposition testimony as to the various non-primitive recreational activities around the Lakefront Trail is irrelevant.

3-106 provided immunity only for negligence, whereas section 3-107 provided absolute immunity. *Id.* at 492-93. The *Goodwin* court then went on to consider how the property described in section 3-107(b) differed from the property described in section 3-106. *Id.* at 493. The court stated as follows.

> "Reading section 3-107 *as a whole* indicates that the property referred to therein is unimproved property which is not maintained by the local governmental body and which is in its natural condition with obvious hazards as a result of that natural condition. Thus, access roads that are not maintained as city, town, or village streets or county, State, or Federal highways or township or road district highways are included in section 3-107(a). Such roads generally would be used only for access to unimproved, undeveloped recreational areas and generally not for access to developed city parks located within the city limits." (Emphasis added.) *Id.*

The *Goodwin* court explained that the legislature extended absolute immunity for injuries sustained on the properties specified in section 3-107(b) because of the burden that maintaining those types of properties would impose on governmental entities. *Id.* Further, the court stated, "requiring such maintenance would defeat the very purpose of these types of recreational areas, that is, the enjoyment of activities in a truly natural setting." *Id.* The *Goodwin* court distinguished *Scott* on the basis that *Scott* interpreted section 3-107(a), while its decision involved section 3-107(b). *Id.* The court also stated that to the extent its reasoning differed from the *Scott* court's reasoning, it believed the *Scott* court's reasoning was wrong. *Id.*

¶ 34    Subsequent to *Goodwin*, our court in *Brown* agreed that "paved bicycle paths which traverse developed city land" are not "riding trails" for purposes of section 3-107(b). *Brown*, 284 Ill. App. 3d at 1101. The plaintiff in *Brown* fell on a paved bike path in a forest preserve. *Id.* at 1099. Noting that "trail" was defined as a "marked path through a forest or mountainous region," the court found section 3-107(b) applied to the bike path, which was designed to provide access to natural and scenic wooded areas around a lake. (Internal quotation marks omitted.) *Id.* at 1101. The court explained that it was irrelevant whether the path was paved, as the area in which the plaintiff fell was not "developed" simply because the path on which he was riding happened to be paved. *Id.*

¶ 35    Similarly, in *Mull v. Kane County Forest Preserve District*, 337 Ill. App. 3d 589, 592 (2003), the court held a gravel bicycle path, which ran through some developed areas but was surrounded by wild grasses and shrubs, was a "trail" under section 3-107(b). The court distinguished *Goodwin* on the basis that the trail in *Goodwin* was located in a developed city park, whereas the trail in *Mull* was "surrounded by wooded or undeveloped land" and ran "through a forest preserve." *Id.*

¶ 36    Following *Mull*, the court in *McElroy v. Forest Preserve District*, 384 Ill. App. 3d 662, 666, 669 (2008), held that a wooden bridge in a forest preserve was part of a "hiking" or "riding trail" under section 3-107(b). In doing so, the court expressed its disagreement "with *Goodwin*'s contention that a trail must be 'unimproved' in order to fall under section 3-107(b)." *Id.* at 667. The court noted that *Mull* and *Brown* both involved arguably "improved trails" and that those cases distinguished *Goodwin* on the basis that the trail in *Goodwin* ran though a developed city park. *Id.*

¶ 37    After reviewing the aforementioned cases, we agree with plaintiff that the legislature could not have intended section 3-107(a) of the Act to apply to the Lakefront Trail. We recognize, as the Park District points out, that *Scott* analyzed the defendant's immunity under section

3-107(a) of the Act. By contrast, *Goodwin*, *Brown*, *Mull*, and *McElroy* each considered the defendants' immunity under section 3-107(b). Nonetheless, in light of the case law that has developed subsequent to *Scott*, we find *Scott* unpersuasive.

¶ 38    First, we disagree with the *Scott* court that the plain language of section 3-107(a) is unambiguous. See *Scott*, 263 Ill. App. 3d at 857. As previously detailed, section 3-107(a) of the Act immunizes a local public entity from liability for an injury caused by a condition of "[a]ny road which provides access to fishing, hunting, or primitive camping, recreational, or scenic areas." 745 ILCS 10/3-107(a) (West 2012). This language can reasonably be interpreted as both of the parties suggest. On the one hand, the statute can be read to provide immunity for injuries arising on roads providing access to primitive camping areas, primitive recreational areas, and primitive scenic areas. However, the statute can also be read as providing immunity for injuries arising on roads that provide access to primitive camping, recreational areas, and scenic areas. Thus, we find the statute to be ambiguous. See *Brunton*, 2015 IL 117663, ¶ 24 (a statute is ambiguous if it can be understood by reasonably well-informed persons in two or more different ways).

¶ 39    Because section 3-107(a) is ambiguous, we may utilize the doctrine of *in pari materia* to interpret its meaning. In doing so, it is appropriate to consider section 3-107(a) *in pari materia* with section 3-107(b). See *Collinsville*, 218 Ill. 2d at 185-86 (under the doctrine of *in pari materia*, we construe two statutes dealing with the same subject so that they are given harmonious effect; the doctrine also applies to different sections of the same statute and is consistent with the rule of statutory construction that we must view all of the provisions of a statute as a whole).

¶ 40    As previously detailed, since the *Scott* decision, Illinois courts have uniformly found section 3-107(b) does not apply to trails in developed areas. See *Brown*, 284 Ill. App. 3d at 1101 (paved bike paths that traverse developed city land are not "riding trails" under section 3-107(b)); *Goodwin*, 268 Ill. App. 3d at 493-94 (a paved bike path in a developed city park is not included within section 3-107(b)); see also *Mull*, 337 Ill. App. 3d at 592 (distinguishing *Goodwin* on the basis that the trail in *Goodwin* was located in a developed city park). That section 3-107(b) has been limited to trails in undeveloped areas supports a determination that section 3-107(a) was likewise intended only to apply to access roads to undeveloped and primitive areas. Further, we note, the legislature clearly limited immunity under section 3-107(a) to access roads to "primitive" camping areas as opposed to all camping areas. It is logical to infer that the legislature likewise intended section 3-107(a) to apply only to primitive recreational and scenic areas where it listed recreational and scenic areas in the same sentence as "primitive" camping areas. In sum, consideration of section 3-107 as a whole supports a finding that section 3-107(a) was intended only to apply to roads providing access to primitive, undeveloped recreational areas.

¶ 41    Considering section 3-107(a) *in pari materia* with section 3-106 further supports our determination. Both sections 3-106 and 3-107(a) involve recreational property; yet, section 3-106 provides immunity only for ordinary negligence, whereas section 3-107(a) provides absolute immunity. Noting this distinction, the *Goodwin* court found section 3-107 *as a whole* referred to unimproved property, which the local government did not maintain and which was "in its natural [state] with obvious hazards as a result of that natural condition." *Goodwin*, 268 Ill. App. 3d at 493. The court explained that the legislature extended absolute immunity to the property outlined in section 3-107(b) because of the burden a local governmental entity would

experience in having to maintain such property in a safe condition. *Id.* Further, the *Goodwin* court explained, requiring the government to conduct maintenance on this type of property "would defeat the very purpose of these types of recreational areas, that is, the enjoyment of activities in a truly natural setting." *Id.*

¶ 42　　We find the *Goodwin* court's reasoning to be logical and persuasive. By immunizing a public entity from liability for injuries occurring on the property specified in section 3-107, the legislature has, in effect, relieved public entities from the burden of having to maintain such property. See *Sites v. Cook County Forest Preserve District*, 257 Ill. App. 3d 807, 811 (1994) (inferring the statutory intent of section 3-107 "is to relieve public entities from the duty to maintain such access roads, which may be unpaved and uneven."). It makes sense that the legislature would relieve a public entity from maintaining access roads to primitive scenic and recreational areas because maintaining those roads would defeat the purpose of the primitive property, *i.e.*, its enjoyment in its natural state. *Goodwin*, 268 Ill. App. 3d at 493.

¶ 43　　In sum, we conclude section 3-107(a) of the Act applies only to access roads to primitive recreational and scenic areas and does not apply to the Lakefront Trail. Based on our finding, we need not consider plaintiff's alternative arguments, *i.e.*, that the Lakefront Trail was not a "road" and that it did not provide "access." We also need not address plaintiff's argument that a conflict exists between sections 3-106 and 3-107(a) of the Act given our finding that section 3-107(a) of the Act does not apply.

¶ 44　　　　　　　　B. Immunity for Willful and Wanton Conduct Under Section 3-106

¶ 45　　Having determined that section 3-107(a) does not apply to the Lakefront Trail, we must now consider whether the Park District was entitled to summary judgment based on section 3-106 of the Act, which provides immunity against negligent conduct but not willful and wanton conduct. 745 ILCS 10/3-106 (West 2012). Plaintiff argues the trial court erred by finding no genuine issue of material fact existed that the Park District engaged in willful and wanton conduct. He posits the Park District acted willfully and wantonly in its maintenance of the Lakefront Trail or, at the very least, a genuine issue of material fact exists as to whether the Park District was willful and wanton.

¶ 46　　Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2012). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶ 42. "The purpose of summary judgment is not to try a question of fact, but to determine whether a genuine issue of material fact exists." *Illinois State Bar Ass'n Mutual Insurance Co. v. Law Office of Tuzzolino & Terpinas*, 2015 IL 117096, ¶ 14. We review the trial court's decision to grant summary judgment *de novo*. *Bowman v. Chicago Park District*, 2014 IL App (1st) 132122, ¶ 43.

¶ 47　　The Act defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210 (West 2012). "Whether a person is guilty of willful and wanton conduct is a question of fact for the jury and should rarely be ruled upon as a matter of law." (Internal quotation marks omitted.) *Robles v. City of Chicago*, 2014 IL App (1st) 131599, ¶ 17. However, "a court may hold as a

- 10 -

matter of law that a public employee's actions did not amount to willful and wanton conduct when no other contrary conclusion can be drawn." (Internal quotation marks omitted.) *Thurman v. Champaign Park District*, 2011 IL App (4th) 101024, ¶ 10. In deciding whether a willful and wanton conduct charge should have been submitted to the jury, neither the trial court nor our court may resolve conflicts in the evidence or decide the weight to be given the evidence or the relative credibility of the witnesses. *Robles*, 2014 IL App (1st) 131599, ¶ 17.

¶ 48 Initially, we note, the Park District characterizes the "willful and wanton" standard as "a high standard of culpability" that approaches "the degree of blame associated with intentional harm." Plaintiff challenges the Park District's characterization. The parties' dispute in this regard stems from the legislature's 1998 amendment to section 1-210, in which it added the following language to the statute without modifying the definition of willful and wanton conduct: "[t]his definition shall apply in any case where a 'willful and wanton' exception is incorporated into any immunity under this Act." Pub. Act 90-805, § 5 (eff. Dec. 2, 1998) (amending 745 ILCS 10/1-210).

¶ 49 Plaintiff argues the legislature's amendment did not impose a heightened willful and wanton standard, citing to *Murray v. Chicago Youth Center*, 224 Ill. 2d 213 (2007), and *Harris v. Thompson*, 2012 IL 112525. However, the Park District insists that plaintiff's reliance on *Murray* is misplaced because the *Murray* court expressly declined to review the legislative intent of the 1998 amendment. See *Murray*, 224 Ill. 2d at 242-43. The Park District cites to *Thurman*, in which the appellate court stated the legislature used "strong language" in defining willful and wanton conduct and found the statutory definition of willful and wanton applied "to the exclusion of inconsistent common-law definitions." *Thurman*, 2011 IL App (4th) 101024, ¶ 13. The Park District also relies on hearing transcripts from the General Assembly pertaining to the 1998 amendment. Based on these transcripts and *Thurman*, the Park District argues the definition of "willful and wanton" in section 1-210 of the Act does impose a high standard of culpability under the law.

¶ 50 We need not resolve the dispute between the parties regarding the Park District's characterization of the willful and wanton standard because, fundamentally, the parties agree that the definition governing plaintiff's claim is the statutory definition set forth in section 1-210 of the Act. In other words, the parties agree that whether the Park District was willful and wanton turns on whether the Park District acted with utter indifference to or conscious disregard for the safety of patrons. Accordingly, this is the definition we will utilize in determining the propriety of the court's decision to grant summary judgment, and we need not determine whether the Park District's characterization of this standard as a "high standard" is correct. See *Barr v. Cunningham*, 2016 IL App (1st) 150437, ¶ 16 (although the defendants challenged the plaintiff's citation to a supreme court case, the plaintiff cited that case only for the proposition that willful and wanton conduct existed on a continuum; ultimately, the parties agreed that the overarching issue was whether the plaintiff "acted with conscious disregard for the safety of the others" (internal quotation marks omitted), and thus, both parties agreed the defendants' actions should be measured against the Act's definition of willful and wanton).

¶ 51 We turn then to whether the trial court properly granted summary judgment. Plaintiff argues the court erred because the evidence shows the Park District was willful and wanton or a genuine issue of fact exists as to whether it was willful and wanton. Plaintiff posits that after learning of the defect, the Park District did not repair it until July, even though it had the ability to conduct an emergency repair. Further, plaintiff observes, the Park District did not barricade

the gap or mark it with paint. The Park District responds that the facts in this case do not in any way show it was willful and wanton where, upon learning of the defect, it immediately engaged in efforts to repair the crack.

¶ 52    In *Palmer v. Chicago Park District*, 277 Ill. App. 3d 282, 284 (1995), the plaintiff alleged that he injured himself when his leg became caught in a large portion of wire mesh fence that had fallen in a playlot and had been lying on its side for three months. *Id.* The court found the plaintiff stated a cause of action for willful and wanton misconduct where he pled that the defendant knew or should have known about the fence and took "no corrective action to repair or warn about" it. *Id.* at 288-89.

¶ 53    On the other hand, in *Lester v. Chicago Park District*, 159 Ill. App. 3d 1054, 1055, 1060 (1987), the court found the plaintiff failed to set forth a claim of willful and wanton conduct where the plaintiff alleged the Park District caused ruts and holes in a softball field and refilled them with improper materials. The court agreed with the Park District that the Park District's rehabilitative acts of filling in the holes and ruts "indicated a concern for possible injuries" and did not amount to "utter indifference" or "conscious disregard" for the safety of patrons' lives. *Id.* at 1059. The court explained that to equate the Park District's actions of discovering the condition and "taking affirmative rehabilitative acts after such discovery in an attempt to remedy the problem with willful and wanton conduct would render that standard synonymous with ordinary negligence." *Id.*

¶ 54    Here, there is no dispute that the Park District knew of the defect prior to plaintiff's injury, although the parties dispute the exact date on which the Park District learned of the crack. Our review of the record shows the Park District became aware of the defect no earlier than May 2013, although it may have learned of the defect later than May 2013. Arlow testified he could "[n]ot exactly" recall when he received the patron's complaint regarding the defect but he knew it was during the spring. Arlow then testified there was no snow on the ground when he received the call and thus "[i]t had to be later than April." Gernady testified that he received Arlow's call regarding the complaint in the spring of 2013. When asked in what month, Gernady stated in the "time zone of June." We note that plaintiff suggests the Park District also knew of the defect based on Gernady's annual spring inspection; however, plaintiff has not cited to any portion of the record establishing that Gernady noticed the defect during his inspection or that the defect existed at that time.

¶ 55    Turning to the actions of the Park District after learning of the defect, we agree with plaintiff that whether the Park District was willful and wanton is an issue of fact. We note the Park District did take *some* action to repair the defect. After receiving the patron's call, Arlow inspected the defect and contacted Gernady, who included it in the scope of repairs to be submitted for bid to the rapid response contractors. The defect was repaired through the rapid response process on July 10. On the other hand, however, Rejman testified the rapid response system is to be used only for jobs that do not present safety concerns, but the defect in this case was classified as an emergency—the sole 2013 Lakefront Trail repair to be classified as such. Further, the evidence showed the Park District had methods by which to expedite the repair process, such as immediately contacting a contractor or alerting the contractor that a repair is urgent. Arlow also testified that a defect less severe was repaired in 2014 by in-house laborers. Notably, the evidence also showed that while the rapid repair process was taking place, the Park District did not engage in any efforts to barricade, mark, or otherwise warn patrons of the defect. See *Palmer*, 277 Ill. App. 3d at 289 (finding the plaintiff alleged willful and wanton

- 12 -

conduct where the plaintiff alleged the defendant took no corrective action to repair or warn about the fence).

¶ 56 In light of all of the foregoing, it was inappropriate for the trial court to hold as a matter of law that the Park District was not willful and wanton. See *Thurman*, 2011 IL App (4th) 101024, ¶ 10 (a court may hold as a matter of law that a public employee's actions did not amount to willful and wanton conduct only where "no other contrary conclusion can be drawn" (internal quotation marks omitted)). Instead, whether the Park District's actions amounted to willful and wanton misconduct is a question of fact. It is for the trier of fact to consider the efforts the Park District made to repair the defect and evaluate whether those efforts demonstrated utter indifference to or conscious disregard for patrons' safety in light of the evidence that the Park District failed to warn patrons of the defect, barricade the defect, or expedite the repair process, despite the defect having been recognized as dangerous and in need of emergency repair. Accordingly, the trial court improperly granted summary judgment.

¶ 57 Plaintiff's reliance on *Lester* does not convince us otherwise. The plaintiff in *Lester* alleged that he was injured because the Park District repaired a defect but did so improperly. See *Lester*, 159 Ill. App. 3d at 1055-56. By contrast, here, the plaintiff was injured because the Park District had not yet repaired the defect.

¶ 58 In sum, we conclude the trial court erred by granting summary judgment.

¶ 59 III. CONCLUSION

¶ 60 For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 61 Reversed and remanded.